430 So.2d 357 (1983)
Clarence JONES, Plaintiff-Appellant,
v.
EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY, et al., Defendants-Appellees.
No. 82-765.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1983.
*358 Neblett, Beard & Arcenault, Richard Beard, and Richard Arcenault, Alexandria, for plaintiff-appellant.
Franklin, Moore & Walsh, Michael Caldwell, Baton Rouge, for defendants-appellees.
Before FORET, CUTRER and DOUCET, JJ.
FORET, Judge.
Clarence Jones (plaintiff) brought this product liability action to recover damages for personal injuries, etc., when the battery in one of his automobiles exploded. Named defendants are: Sears, Roebuck & Company (Sears), the vendor of the battery; Globe Union, Inc. (Globe), the manufacturer of the battery[1]; and, Employers Insurance of Wausau (Employers), Globe's and Sears' alleged public liability insurer.[2]
The trial court, after trial on the merits, rendered judgment in favor of defendants, dismissing plaintiff's claim against them.
Plaintiff appeals from that judgment and raises the following issues:
(1) Whether the trial court erred in finding that plaintiff had failed to prove that the battery in question was defective; and,
(2) Whether the trial court erred in basing its decision on circumstantial evidence, rather than direct evidence, as to the cause of the explosion.

FACTS
Plaintiff is the owner of a 1967 Plymouth Belvedere. On the afternoon of June 13, *359 1979, plaintiff was unable to start this vehicle, and had to use his wife's automobile to drive to work. He returned from work at approximately 9:00 P.M. that day, and once again attempted to start the Plymouth. He was unable to do so and proceeded to open the hood, planning to find the cause of the trouble. Shortly thereafter, the automobile's battery exploded, propelling sulfuric acid and bits of plastic into his face. Plaintiff's wife heard the explosion and rushed outside to see what had happened. Upon seeing plaintiff clutching his face with both hands, she led him to their home and immediately began to rinse plaintiff's face with water. He was then taken to the emergency room at the Huey P. Long Charity Hospital in Alexandria.
The emergency room physician sutured the lacerations on plaintiff's face, and he was seen the next morning by an ophthalmologist employed by the Veterans Administration. He was told to report to the U.S. Veterans Administration facility in Alexandria for treatment for his eye injury. Apparently, the acid permanently damaged plaintiff's right eye, leaving him with only peripheral vision in that eye. Plaintiff instituted this action alleging that the battery was defective, and that said defect was a cause of the harm he suffered. In the alternative, plaintiff alleged that defendants were negligent in the engineering, design, and manufacturing of the battery.

ALLEGED "DEFECTIVE" BATTERY
Plaintiff contends that the trial court erred in finding that he had failed to prove that the battery was defective. He argues that the evidence clearly shows that it was defective.[3]
A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who, without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. See Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (La.1971), and authorities cited therein.
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them. See Weber v. Fidelity & Casualty Insurance Co. of New York, supra, and authorities cited therein.
Finally, it is settled in Louisiana that the non-manufacturer seller of a defective product is not responsible for damages in tort absent a showing that he knew or should have known that the product sold was defective. Hudgens v. Interstate Battery Systems of America, Inc., 393 So.2d 940 (La.App. 3 Cir.1981); Reeves v. Great Atlantic & Pacific Tea Company, Inc., 370 So.2d 202 (La.App. 3 Cir.1979), writ denied, 371 So.2d 835 (La.1979), and authorities cited therein.
The parties, prior to trial, stipulated that the battery was manufactured by Globe. Sears admitted that it sold the battery to plaintiff approximately one year before the accident. Plaintiff testified that he had never worked on the battery, nor had any trouble with it, prior to the accident. He stated that although it was approximately 10:00 P.M. when he made his second attempt to start the Plymouth, there was plenty of light for him to see into the engine compartment. The sources of this light were a street light located in the vicinity of the parked vehicle, and a porch light on his home. The parties introduced certain photographs of the accident scene in evidence, which showed the placement of plaintiff's vehicle at the time of the accident. These photographs clearly show that *360 the raised hood on the vehicle would cast a shadow across the engine compartment by blocking light radiating from the street light. Further, plaintiff admitted that, when he went to look into the engine compartment, he placed himself in between the porch light and the engine compartment. Under direct examination, plaintiff denied that he had a flashlight, cigarette lighter, or matches on him at the time of the accident, and stated that the street light and the porch light provided him with sufficient light to see what he was doing. However, under cross-examination, plaintiff was asked:
"Did you ordinarily carry matches with you?"
Plaintiff replied:
"Mmmno, not, uh, No, Ino. I always has a cigarette lighter of some kind."
Plaintiff's wife testified that plaintiff went outside to work on the vehicle right after returning home from work. She was talking on the telephone at the time, when she heard something that sounded like a gunshot. She ran outside and asked plaintiff what had happened. She then led him back onto the porch and began washing his face with water. She stated that plaintiff had nothing in his hands when she first saw him after the accident. She did not look around to see if there was a match or a cigarette lighter in the area. However, she went to close the hood on the vehicle the next day and stated that she did not see any matches or cigarette lighter.
George Pappas was called as an expert witness by plaintiff. After extensive questioning as to his qualifications, the trial court accepted him as an expert in the fields of chemical engineering and technical investigation. He gave detailed testimony on how an automobile battery works. He stated that two of the by-products of the chemical reaction by which the battery produces electricity are hydrogen and oxygen. He further stated that a mixture of hydrogen and oxygen containing anywhere from 4% to 75% hydrogen will allow the hydrogen to burn, and can be explosive if confined. He examined the battery and performed non-destructive tests on it. He described the Globe battery as being a 12 volt battery consisting of six separate cells wired together. Pappas testified that the battery had "bar type vents" which provide ventilation for the gasses produced by it. It was his opinion that these type vents are inferior to individual vents for each cell for purposes of providing proper ventilation of gasses. He believed that the passageways in the bar type vents were so small that they could become clogged with dust, etc., when being used.
Pappas stated that he found evidence of two short circuits between the intercell connectors in the battery. Based on this, he opined that the short circuits provided the spark necessary to ignite the hydrogen within the battery, and that this was the cause of the explosion. He further based his opinion on carbon deposits found inside the battery. It was also Pappas' opinion that the vent caps were on the battery at the time of the explosion because of small cracks in them, indicating to him that some force had pushed them off the battery. Finally, he stated that he had seen batteries that had exploded, when hydrogen right above the battery had been ignited, and that one could tell this had happened because the plastic on top of the battery would melt. He felt that the warning on the battery was deficient in that it failed to specify that goggles should be worn by anyone working near the battery.
Pappas admitted that the battery he was using as a model to demonstrate his theory for the trial court was different from the Globe battery. He further admitted that he made no tests on the separators used in the battery to determine if they were brittle, although he made the remark that separators in some batteries are brittle. Pappas stated that these batteries do not produce hydrogen and oxygen when they are discharging, i.e., when electricity is being used to turn the starter motor, etc. He agreed that there was no way to prevent these batteries from producing hydrogen and oxygen.
*361 Everette C. Wilson, the manager of technical services for Globe, was accepted as an expert in the fields of: automotive mechanics, particularly automotive electric systems; battery design manufacture; and, battery explosions and investigation of battery explosions. He used a cut-away model of a battery nearly identical to the one in question to illustrate his testimony. He stated that the model used by Pappas looked like it was approximately thirty to forty years old. Wilson testified that the separators in the Globe battery were not brittle, and he stated that Pappas was wrong in testifying that they were made of a plastic rubberized material. Wilson testified that they were made out of resin bonded cellulose fibers, which become soft and flexible when covered by electrolyte chemicals. He stated that the purpose for making the separators out of this material was to prevent oppositely charged plates from coming together as a result of vibrations, etc., caused by operation of the vehicle. Wilson described the venting system on the battery in detail. He explained that one does want to vent out the hydrogen and oxygen gasses, but at the same time keep water vapor and sulfuric acid vapor from venting out. The baffled passageways in the bar type vents accomplish this by providing a large surface area on which these vapors can condense and flow back into the battery. Another function performed by these vent caps is to prevent contaminants from entering the battery.
Wilson disputed Pappas' testimony that the passageways in the vent caps were too small. He explained that the vents were placed beneath the bar, which is an area that tends to stay much cleaner than the top of the bars. As did Pappas, Wilson testified that the bar type vents contained a flame barrier system to prevent any flame outside the battery from reaching the inside, where it could cause an explosion. Also, by placing the vents on the bottom, one can have the gasses coming out of a slot, rather than a round hole, which dissipates the hydrogen more rapidly into the surrounding air. Wilson noted that, by performing certain back pressure and gassing tests, his company was able to design a venting system that has about twenty times the venting capacity needed for proper ventilation of gasses. He also noted that the bar type vents on the Globe battery had a backup system in case of failure of the main ventilation system. This backup system uses a "pressure release valve" which pops open if the pressure inside the battery reaches between one and one and one-half pounds per square inch.
Wilson was asked to explain how batteries can explode. He stated that there is what is called the "ullage" chamber in all batteries of this type. This is the space between the top of the electrolyte fluid and the cover of the battery. Hydrogen and oxygen can accumulate in this space and, if the mixture is right and a source of ignition is provided, there will be an explosion. He noted that hydrogen burns at an extremely fast rate and will build up internal pressure very quickly, if burned in a confined area. He disputed Pappas' testimony that the ignition of hydrogen on the outside of a battery would cause the plastic casing to melt. He explained that hydrogen burns too fast and produces too little heat for this to occur. Only the sustained burning of hydrogen near plastic would cause it to melt.
Wilson testified that the warning on top of the Globe battery resulted from a cooperative effort between industry and the Consumer Products Safety Commission (CPSC), an agency of the U.S. Government. Wilson stated that he was a member of a committee of the Battery Council International that worked with the CPSC in formulating the warnings. Wilson testified as to a number of other steps taken by his company and others to produce a safer battery. His company developed the flame barrier system mentioned above and patented it.
Wilson examined the Globe battery and stated that it had been subjected to a very abusive type of service. The water had been replenished in it at least one time, and one of the vent caps had been improperly removed in the past. There had been considerable overcharging of the battery, resulting in water loss, heat deterioration of *362 the separators, and warping of the positive and negative plates. Eventually, this results in failure of the battery. He also noted that some of the elements of the battery contained carbon black which will accumulate and float on top of the electrolyte. By looking at the carbon black deposits on the side walls of the battery, Wilson was able to tell that the electrolyte level had fallen as much as 3/16; to ¼ of an inch below the top of the plates. The specifications call for keeping the electrolyte level at least 7/8 of an inch above the plates. There were also indications that someone had taken a sharp instrument and jammed it down between one of the terminals and the connector to that terminal.
Wilson then gave his opinion as to how the explosion occurred. He stated that there were really a series of six explosions proceeding from the number one cell to the number six cell. These explosions were relatively weak, indicating a low concentration of hydrogen in the ullage chamber. This was consistent with plaintiff's testimony that the vehicle had been sitting unused for a considerable period of time. He estimated that the electrolyte was approximately ¼ of an inch below the top of the plates in the number one cell at the time of the explosion. He could find no evidence of internal ignition. It was his opinion that one of the vent caps was on the battery at the time of the explosion, and the other one had been removed. His opinion was based on the fact that one of the vent caps had suffered more serious damage in the explosion than the other. However, he believed that the vent cap that was off was lying on top of the battery at the time of the explosion, because it had sustained some damage. He was of the definite opinion that an external source of ignition had ignited the hydrogen in the number one cell causing the explosion. Wilson explained the quality control methods used by his company to preclude inferior materials from reaching the manufacturing process.
After thoroughly reviewing the record, it is our opinion that the trial court correctly found that plaintiff had failed to prove the existence of any defect in the battery.

CIRCUMSTANTIAL VS. DIRECT EVIDENCE
The trial court, in its written reasons for judgment, noted the evidence that had been adduced by both parties. The trial court then stated:
"Was the battery defective or did the explosion occur because the plaintiff placed an open flame too near it? The Court has the direct testimony of the plaintiff and the circumstantial evidence offered by defendants. The rule as to circumstantial evidence is set forth in the cases of Campbell v. Mouton, 373 So.2d 237 (La.App.1979); A. & M. Pest Control Service v. Fejta Construction Company, 338 So.2d 946 (La.App.1976) and Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395, 397 as:
"Taken as a whole, circumstantial evidence must exclude other reasonable hypothesis with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation."
"In the instant case, the plaintiff's evidence, when compared to that offered by defendants, is not strong enough to convince the Court that his version is more probably so than not so. The accident occurred at night in an area of diminished light. The plaintiff was making an examination to determine why the engine of his car would not start. When the two experts are compared, the testimony of Mr. Wilson is of greater weight because, in the Court's opinion, it is based upon greater knowledge and experience in the field. When all of the evidence is examined and compared, in the Court's opinion, the plaintiff has failed to carry his burden of proof and show that the battery was defective."
*363 The issue is whether, taken as a whole, the circumstantial evidence adduced by defendants excludes the reasonable hypothesis that the battery was defective with a fair amount of certainty. We conclude that it does. It is true that plaintiff had the burden of proving that the battery was defective, rather than defendants having to prove that it wasn't. However, in making its determination of whether a plaintiff has met his burden of proof, the trial court must consider all of the evidence adduced. Essentially, plaintiff's burden of proof is the same whether his cause of action is based on negligence or strict liability, i.e., that the fact or causation sought to be proved is more probable than not. The only difference is the elements that plaintiff must prove in an action based on negligence as opposed to strict liability. This is clearly shown when one compares the discussion of plaintiff's burden of proof found in Weber v. Fidelity & Casualty Insurance Company of New York, supra, an action based on strict liability, with the discussion on the same subject found in Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (La.1971), an action based on negligence.[4]

DECREE
For the above and foregoing reasons, the judgment of the trial court is affirmed.
All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.
NOTES
[1] Globe Union, Inc. was acquired by Johnson Controls, Inc. approximately 3½ years prior to the trial on the merits of this action. It ceased to exist as a separate corporate entity approximately 1½ years prior to trial, when it became the Globe Battery Division of Johnson Controls, Inc.
[2] Plaintiff's petition erroneously named Employers Mutual Liability Insurance Company of Wisconsin as a defendant to this action. Defendants admitted that Employers issued a policy of insurance to Globe. However, this policy was never introduced into evidence. There was no evidence adduced to indicate that Employers had issued any insurance policy to Sears.
[3] Plaintiff has apparently abandoned his alternative cause of action based on negligence.
[4] Justice Tate was the author of both opinions.