745 So.2d 793 (1999)
Dora SLAID, et al., Plaintiffs-Appellants,
v.
EVERGREEN INDEMNITY, LTD., et al., Defendant-Appellee.
No. 32,363-CA.
Court of Appeal of Louisiana, Second Circuit.
October 27, 1999.
*794 Maughan, Atkinson & Martin by Roy Maughan, Baton Rouge, Counsel for Plaintiffs-Appellants.
*795 Mayer, Smith & Roberts by Caldwell Roberts, Shreveport, Counsel for Defendant-Appellee.
Before NORRIS, C.J., and BROWN and PEATROSS, JJ.
NORRIS, Chief Judge.
The plaintiffs, Dora Slaid, et al., appeal a summary judgment dismissing all claims against defendant, Commercial National Bank ("CNB") and its successor, Deposit Guaranty National Bank ("DGNB"). Finding that genuine issues of material fact remain unresolved, we reverse and remand.

Facts
Beginning in July, 1993, Dora Slaid leased a three bedroom mobile home owned by Tom and Leona Walker, living there with her husband, three daughters, and stepson. On December 17, 1993, a fire broke out under a Christmas tree in the living room. At the time of the fire, Slaid's three daughters, Tina Nichole Leone, age 13, Gina,[1] age 6, and Lacey, age 9 were apparently home alone.
To escape the fire, Lacey ran out the front door, suffering burns. Tina and Gina fled to the master bedroom at one end of the mobile home, where a telephone was located. Since the fire began in the middle of the home and the bedroom was on one end, they quickly became trapped. Slaid's stepson and other men who were outside when the fire broke out attempted to rescue the girls by trying to break the master bedroom's window. They were unsuccessful, however, because the window was made of solid plexiglass which was screwed into the trailer's frame. Although the men hit the window with solid objects, it did not yield. After about ten minutes of effort, one rescuer finally ripped off part of the trailer's siding, creating a hole from which the girls could be removed.
The fire destroyed the mobile home. Tina was killed in the fire and Gina suffered disfiguring third degree burns over a large portion of her body which required extensive surgeries. Lacey also suffered burns in the fire, but to a lesser degree.
The affidavits accompanying the bank's summary judgment motion and Slaid's objection to summary judgment, as well as the depositions of bank officers Charles Upchurch and Adalberto Cantu, document CNB's relationship to the home in question. Between 1988 and December, 1993, CNB acquired a number of mobile homes from defaulted loans; all of these were subsequently resold to consumers. CNB would send these homes to local mobile home dealers to make any necessary repairs to the home and then resell the home for the bank on a commission basis. Before selling mobile homes it acquired by legal repossession or voluntary surrender, it was CNB's practice to conduct a valuation estimate of the home. The dealer would also inspect the homes to determine whether it was financially feasible to repair the home, and if so, to present CNB with an estimate. CNB would either authorize the repair or instruct the dealer to sell the home "as is."
CNB acquired and resold the Slaid home on several occasions. In 1984, CNB first acquired ownership of the home when its initial owners defaulted on their loan. The home was then resold to Michael and Ramone McCartney on June 17, 1984. The record is unclear whether or to what extent repairs were made before selling the home to the McCartneys. CNB subsequently reacquired the home from the McCartneys by voluntarily surrender in June, 1993 pursuant to a debtor's Chapter 13 plan in the bankruptcy court.
When the home was once again in CNB's possession in 1993, bank officer Charles Upchurch conducted an inspection of it, taking several photographs. Three of these photographs are in the record, but none show the window in question. In his affidavit, Upchurch claims that he failed to *796 notice anything unusual about the home, although he admits that he made no effort to determine what material was used to cover the windows. Determining that it would cost at least $3,000 to repair the home, Upchurch recommended that the bank forgo repairs and sell it "as is." The home was subsequently sold to Walker, "as is," on June 24, 1993. Walker, in his affidavit, states that he did not repair any of the home's windows before the Slaids moved in shortly after his purchase.
Slaid initially filed suit against the home's owners, Tom and Leona Walker, and their insurer, Evergreen Indemnity, Ltd. Her amended petition added General Electric Company as a defendant. By means of a second amended petition, plaintiff added CNB and its successor, DGNB. Plaintiff subsequently settled with all defendants but Deposit Guaranty National Bank.
In her second amended petition, Slaid sought recovery under the Louisiana Products Liability Act, La. R.S. 9:2800.52 et seq., claiming that because the bank either "reconditioned" the mobile home or "exercised control over the ... quality of the product," CNB should be regarded as a "manufacturer" under the Act. In the alternative, Slaid alleged that the bank, as a "non-manufacturing seller" of the home, was responsible for damages in tort because it failed to warn when it knew or should have known of the home's defective condition at the time of sale.
DGNB, as the successor to CNB, filed for summary judgment, claiming that since the bank was not in the business of manufacturing or selling mobile homes, and did not hold the home out as its product, then it could not be characterized as a "manufacturer" or "manufacturer/seller" under the Louisiana Products Liability Act. As a "non-manufacturing seller," DNGB claimed that as a matter of law it was not required to inspect a product prior to sale to determine the possibility of inherent vices or defects. Plaintiff countered the latter argument in a supplemental memorandum of law in opposition to summary judgment that argued that even if the bank had no affirmative duty to inspect, that once it assumed the duty to do so, its negligent performance of that inspection created liability.
On the basis of the parties' written submissions, affidavits, depositions, and arguments of counsel, the district court rendered summary judgment in the bank's favor, finding that DGNB was not liable for plaintiffs damages under the Louisiana Products Liability Act. Specifically, the court found the statutory definitions of "manufacturer" inapplicable to the bank. The court also rejected the plaintiffs tort claim finding that "[t]here is no evidence that CNB, or its employees, knew or should have known that plexiglass had been placed on the window. Without this knowledge, there can be no liability." This appeal followed.

Applicable Law
The legal principles regarding summary judgment are well settled. A motion for summary judgment is not to be used as a substitute for trial on the merits. Rapp v. City of New Orleans, 95-1638 (La. App.4th Cir. 9/18/96), 681 So.2d 433, 436-37, writ denied, 686 So.2d 868 (La.1/24/97). A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966; Mixon v. Progressive Specialty Co., 29,698 (La.App.2d Cir.06/18/97), 697 So.2d 662. If the court finds that a genuine issue of material fact indeed exists, summary judgment must be denied. Walker v. Kroop, 678 So.2d 580, 584 (La.App. 4th Cir.1996).
The burden is on the party seeking summary judgment to establish that there is an absence of factual support for one or more of the essential elements of the adverse party's claims. If the nonmoving *797 party then fails to produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden at trial, there is no genuine issue of material fact. La. C.C.P. art. 966; Berzas v. OXY USA, Inc., 29,835 (La.App.2d Cir.09/24/97), 699 So.2d 1149.
Further, La. C.C.P. art. 967 provides that when a motion for summary judgment is made and supported as provided above, the party opposing summary judgment cannot rest on the mere allegations or denials of his pleadings, but must present specific facts showing that material facts are still at issue. La. C.C.P. art. 967. Although the burden of proof remains the same under the recent amendment to La. C.C.P. art. 966, summary judgment procedure is now favored to secure the just, speedy, and inexpensive determination of all except certain disallowed actions. Acts 1996, 1st Ex.Sess., No. 9. We review summary judgments de novo under the same criteria that govern the district court's consideration of the appropriateness of summary judgment. Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191; Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730; Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991).
The Louisiana Products Liability Act establishes the exclusive theories of liability for manufacturers for damages caused by their products. A manufacturer of a product is liable for damages proximately caused by a "characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity." La. R.S. 9:2800.54. "Manufacturer" is defined in the Act, in pertinent part:
(1) "Manufacturer" means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer" also means:
(a) A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
La.R.S. 9:2800.53(1).
In contrast, the Act defines a "seller" as "a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value." La.R.S. 9:2800.53(2). A non-manufacturing seller who does not vouch for the product by holding it out as his own does not incur strict manufacturer's liability under the LPLA, but is responsible for damages in tort "only if he knew or should have known that the product sold was defective, and failed to declare it." Wilson v. State Farm Fire & Cas. Ins. Co., 94-1342 (La.App. 3d Cir. 4/5/95), 654 So.2d 385, 387; Davis v. Burlingame, 607 So.2d 853 (La.App. 2d Cir.1992), writ denied (1993); Hopper v. Crown, 560 So.2d 890, 893 (La.App. 1st Cir.1990); Picolo v. Flex-A-Bed, Inc., 466 So.2d 652 (La.App. 5th Cir.), writ denied, 467 So.2d 1134 (1985); Jones v. Employers Mut. Liability Ins. Co., 430 So.2d 357, 359 (La.App. 3d Cir.1983); Nelton v. Astro-Lounger Mfg. Co. Inc., 542 So.2d 128, 131 (La.App. 1st Cir.1989); Harris v. Atlanta Stove Works, Inc., 428 So.2d 1040, 1043 (La.App. 1st Cir.), writ denied, 434 So.2d 1106 (1983). In addition, a non-manufacturing seller "is not required to inspect a product prior to sale to determine the possibility of inherent vices or defects." Harris v. Atlanta, supra; Nelton, supra; *798 Parks ex rel. Parks v. Baby Fair Imports, Inc., 98-626 (La.App. 5th Cir. 12/16/98), 726 So.2d 62, 64.
If a person undertakes a task which he otherwise has no duty to perform, however, he must nevertheless perform that task in a reasonable and prudent manner. Moore v. Safeway, Inc., 95-1552 (La.App. 1st Cir.11/22/96), 700 So.2d 831, 846; Crane v. Exxon Corp., 613 So.2d 214 (La.App. 1st Cir.1992); Marsalis v. La-Salle, 94 So.2d 120 (La.App.Or.Cir.1957). Negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability. Id.; Rick v. State, DOTD, 93-1776 (La.1/21/94), 630 So.2d 1271, 1275; Brown v. Tesack, 566 So.2d 955, 957 (La.1990); Harris v. Pizza Hut, 455 So.2d 1364, 1371 (La.1984); Carlin v. Rapides Parish Police Jury, 584 So.2d 337, 339 (La.App. 3d Cir.1991); Barnes v. Bott, 571 So.2d 183, 186 (La.App. 4th Cir. 1990), writ denied, 573 So.2d 1141 (La. 1991); RESTATEMENT (SECOND) OF TORTS § 324(A).
Duty, as it applies to tort liability, is a question of law. Harris v. Pizza Hut, supra. The particular facts and circumstances of each individual case determine the extent of the duty and the resulting degree of care necessary to fulfill that duty. Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991).

DiscussionLPLA Liability
Slaid appeals the court's summary judgment dismissing her products liability and negligence action, initially contending that the district court erred when it concluded that DNGB was not a "manufacturer" as contemplated by the LPLA. In short, plaintiff claims that the district court failed to follow the unambiguous language of the Act which includes under its definition of manufacturers a "seller who exercises control over or influences ... [the] quality of the product ..." Alternatively, she claims that the district court erred when it found that the bank did not know, nor should it have known of the plexiglass window covering.
From the documents offered by both parties in support of, or in opposition to summary judgment, it is undisputed that DNGB sold the Walkers a mobile home with a replacement window made of plexiglass in the master bedroom. It is similarly uncontroverted that the window was the proximate cause of plaintiffs' injuries, for had the window not been made of plexiglass and screwed into the home's frame, then the girls would have been easily rescued. Not only did this window deviate in a material way from specifications for otherwise identical models of this mobile home, replacing a window with unbreakable plexiglass is contrary to federal safety specifications contained in the Code of Federal Regulations.[2] It is also undisputed that the home was originally manufactured by Eastwind, and resold on two occasions by CNB when it reacquired the home by legal process. Exactly when, and by whom the window was modified cannot be educed from the record.
From these undisputed facts, Slaid urges that CNB/DNGB should be held strictly liable under the Act for the damages proximately caused by this defect because it is a seller who exercised "control over or influences a characteristic of the design, construction or quality" of the home. In so urging, however, Slaid fails to demonstrate that CNB replaced the window in question, only that CNB authorized repairs, through various mobile home dealers, to an unidentified number of homes which it resold in the 1980's. In fact, there is no record evidence specifying what, if any, repairs were made to her particular mobile home or who actually installed the plexiglass window. As such, she has failed to produce the requisite factual proof required by La. C.C.P. art. 966 to withstand summary judgment on this point.
*799 Moreover, although the record shows that CNB did authorize repairs to a number of the homes it repossessed and subsequently resold, the act of repair itself, intended to increase the homes' resale value and not to alter their basic design, does not rise to the level of control over the manufacturing process or product quality contemplated by the Act to justify the imposition of manufacturer's strict liability. In fact, plaintiff has failed to demonstrate that these authorized repairs were of such a substantial nature as to be considered "remanufacturing, reconditioning, or refurbishing a product" as opposed to merely cosmetic repairs. See also John N. Kennedy, A Primer on the Louisiana Products Liability Act, 49 LA.L.REV. 565, 572 (1989)(in order to be considered a manufacturer under the LPLA one must do something to the product that influences it in a meaningful and creative way.) In addition, given that CNB merely authorized these repairs, and did not exercise any control or supervision over the actual repair and preparation of the mobile home for sale, which was done through various dealers, we find this indirect control not commensurate with the legislative intent of the LPLA and products liability law in general. See, e.g., Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748, 752 (La.1987)(finding, under "professional vendor" analysis, repossessing bank not liable as manufacturer of mobile home where it merely authorized repairs before resale); Parks, supra at 64("We believe that the legislature intended more direct and specific conduct on the part of the seller" where seller placed work order for shirts of a specific fiber content and color which subsequently proved flammable).
From the record, therefore, we conclude that CNB does not fall into any of the enumerated categories listed in the statute as a prerequisite for "manufacturers." CNB did not hold out the home as its own, nor did it vouch for the quality of the home when it sold it to the Walkers "as is." Nor can the bank, as suggested by plaintiff, be considered a "professional vendor" of mobile homes as contemplated by Chappuis v. Sears, Roebuck & Co., 358 So.2d 926 (La.1978), which has in any event been legislatively overruled by the passage of the LPLA. See, e.g., Matthews v. Wal Mart Stores Inc., 97-0449 (La.App. 4th Cir.3/11/98), 708 So.2d 1248, 1249, writ denied 98-0965 (La.6/5/98), 720 So.2d 681. Accordingly, the district court properly granted summary judgment over Slaid's products liability claim. This assignment of error is without merit.

DiscussionTort Liability
From the record, it is undeniable that although CNB's primary business was not the business of selling mobile homes, it nevertheless was "a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value." La. R.S. 9:2800.53(2). It is likewise undisputed that CNB did not give any warning to Walker regarding the window at the time of sale. Walker, in his affidavit, stated that he did not replace the window. As such, it is reasonable to conclude that the defective window (i.e, covered with plexi-glass screwed into the home's frame) was present prior to Walker's purchase and at the time of Upchurch's inspection. Under these circumstances, CNB can only be responsible for damages in tort if it "knew or should have known that the product sold was defective, and failed to declare it." Wilson, supra.
Notwithstanding that CNB/DGNB had no legal duty to inspect the home for inherent vices or defects prior to sale, once it undertook this task through Upchurch's inspection, it assumed a duty to perform the inspection in a non-negligent manner. At issue in this regard is whether a normal, reasonable person in Upchurch's shoes, with his experience and knowledge of mobile homes would or should have taken particular notice of the window's condition, and if so, would he have realized it was a safety hazard or in violation of the *800 federal statute. If a prudent inspection would have uncovered the window's unreasonably dangerous condition, as Slaid contends, then armed with this knowledge, CNB would have had an affirmative duty to alert any future buyer of the potentially dangerous fire hazard created by an unbreakable bedroom window which could not open. Neither side, however, submitted record evidence delineating the nature and scope of Upchurch's inspection, or whether the window's threat to future safety would have been noticeable to a man of Upchurch's training, knowledge, and experience. Although Upchurch admittedly inspected the home's windows, seeing nothing unusual about the home, he also claims that he made no effort to determine what covered the windows. Any negligence, whether in failing to notice the plexiglass window, which plaintiff claims was "apparent," or to alert Walker at the time of purchase, are questions of material fact undoubtedly in dispute and unresolvable with the present record evidence.
We conclude, therefore, that neither side produced sufficient record evidence for us to resolve the issue of CNB/DGNB's knowledge of the window's condition, either actual or constructive, which is intrinsic to plaintiff's case. Summary judgment is rarely appropriate for a determination based on such subjective facts such as intent, motive, malice, knowledge, or good faith. Penalber v. Blount, 550 So.2d 577 (La.1989); Wilson, supra; Viator v. P & A Well Service, Inc., 615 So.2d 51, 52 (La. App. 3d Cir.), writ denied, 617 So.2d 913 (1993).
Based on the foregoing, we conclude that material issues of fact exist regarding the condition of the window and the seller's knowledge or constructive knowledge thereof. Summary judgment is inappropriate because the bank's motion did not convincingly establish that it neither knew or should have known of the defect, as opposed to Slaid's contention that Upchurch's inspection should have revealed the safety hazard. Accordingly, we reverse the district court's grant of summary judgment with regard to plaintiffs tort claim against CNB/DNGB and remand this case to the district court for further proceedings.

Decree
For the foregoing reasons, the summary judgment granted in favor of DNGB is affirmed in part and reversed in part with each party bearing one-half of the costs. The case is remanded to the trial court for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
NOTES
[1] Also referred to in the record as "Bama."
[2] C.F.R. 4:3280.404(2).