WILLIAMS, J.
 

 11 Plaintiff, Kimberly Haley, individually, as the administratrix of the succession of Christopher Neal Haley and as the tutrix of the minor child, Summer Haley, appeals the district coui't’s ruling granting summary judgment in favor of defendants, Johnny Ward, d/b/a Ward Sign Company, and Wellington Specialty Insurance Company. For the reasons that follow, we affirm the district court’s judgment.
 

 FACTS
 

 On August 2, 2006, Christopher Neal Haley suffered a fatal electrical shock while installing an electric sign in Arcadia, Louisiana. Mr. Haley was installing the sign during the course and scope of his employment with Ad Sign Service, Inc. (“Ad Sign Service”).
 

 In the spring of 2006, Hanover Compression Limited Partnership (“Hanover”) ordered a large electric sign to be placed at its facility in Arcadia. Hanover ordered the sign from defendant, Johnny Ward, d/b/a Ward Sign Company (collectively “Ward”), a sign retailer. Thereafter, Ward ordered the sign from Sign Builders, Inc. (“Sign Builders”), a manufacturer of signs located in Birmingham, Alabama. Sign Builders manufactured the sign, which was 20 feet wide, eight feet and one inch long and 20 inches in depth, and shipped it to Ward’s facility in Fairfield, Texas. Ward prepared the sign for installation by inserting the light bulbs, installing the sign’s facing and lettering, fabricating and installing the mounting plate and fabricating the pole for the sign. Ad Sign
 
 *309
 
 Service, which had been hired by Hanover to install the sign, picked the sign up from Ward’s facility in Texas and transported it to Ad Sign’s facility in Minden, |2Louisiana. Ad Sign Service later transported the sign to Hanover’s facility in Arcadia to be installed.
 

 On the day of the accident, Mr. Haley and other Ad Sign Service employees inspected the sign and cleaned it before lifting it to the top of the 35-foot pole. At some point during the process, Mr. Haley got inside the sign’s cabinet. Meanwhile, other Ad Sign Service employees provided an electrical current to the sign to make sure it was working properly. Mr. Haley made contact with the sign and was electrocuted. He died at the scene.
 

 Following the accident, at the request of Ad Sign Service, Milam Electric, Inc. (“Mi-lam Electric”) conducted an investigation of the incident. The following day, in compliance with a request from the United States Department of Labor — Occupational Safety & Health Administration, Roy Milam, vice-president and secretary of Mi-lam Electric, prepared a written report of the investigation. The report stated, in part:
 

 During our inspection of the sign, we found a piece of flexible metallic conduit approximately 16" in length that was connecting the wiring raceways located on the left and right side of the service access opening of the sign to be pulled loose from its connectors. We visually inspected the wires in this conduit and did not find any indication of damage to conductor insulation. Since we could not visually find the short to the frame of the sign, we checked each individual ballast wire to the frame of the sign and found that one of the secondary ballast leads was shorted to ground. We disconnected and removed the ballast and found that one of the red secondary ballast lead[s] had been pinched between the ballast and ballast mounting bolts. We assume that the wire was pinched at the time of fabrication of the sign.
 

 When the installing sign company applied power to the sign, the ballast energized the frame of the sign with ^approximately 600 volts and resulted in a fatal electrical shock to the sign company employee.
 

 [[Image here]]
 

 The sign had one black and one white conductor exiting the base of the pylon for connection to the incoming branch circuit. Our expert opinion would be that if the black and white conductors were reversed, it would have no bearing on this accident since the circuit and ballast was insulated in its entirety except at the point where the ballast wire was pinched.
 

 [[Image here]]
 

 On June 12, 2007, plaintiff filed the instant lawsuit, naming Ward, Wellington Specialty Insurance Company (Ward’s insurer), Hanover, Ad Sign Service, Charles Valentine, Jr. and Charles Valentine, III (the individual owners of Ad Sign Service) as defendants.
 
 [1]
 
 In the petition, plaintiff alleged,
 
 inter alia,
 
 that the sign was defective, the defect existed while the sign was in the custody and control of Ward, and Ward knew or should have known that the defect existed. Plaintiff also alleged that “[d]uring Ward’s work on the sign, it should have been apparent to Ward that the insulation on the ballast wire had been cut and pinched, allowing the current carrying portion of the wire to contact the
 
 *310
 
 steel frame of the sign.” Plaintiff later amended her petition to allege, in part, that Ward failed to properly inspect the sign; that Ward tightened the ballast bolts, which caused the damage to the wire; that Ward failed to make sure that a ground wire was connected to the cabinet of the sign; and, that Ward failed to “check, double check, and triple check everything on the sign” to discover [4any hidden defects.
 

 Ward and Hanover moved for summary judgment. Ward contended he was not a “manufacturer” of the sign within the meaning of the Louisiana Products Liability Act (“LPLA”), and therefore, as a non-manufacturing seller of the sign, he had no duty to inspect the sign for defects. Following a hearing, the district court granted summary judgment, stating:
 

 [Bjased on the facts of this case, it’s a sort of unique case as to someone being a manufacturer. Certainly the manufacturer — the court has been made aware in the first hearing, that the manufacturer of the sign has already settled and has been released from the lawsuit. To make it short, the Court is going to find that there is not sufficient or any issues of material fact as to Ward Sign Company to continue this case....
 

 This appeal followed.
 
 [2]
 

 DISCUSSION
 

 Plaintiff contends summary judgment was not appropriate in this case because there was conflicting evidence with regard to whether Ward was a “partial” manufacturer of the sign within the meaning of the Louisiana Products Liability Act (“LPLA”) and whether Ward knew or should have known of the defect in the sign. According to plaintiff, such evidence created a genuine issue of material fact and summary judgment should not have been granted.
 

 In determining whether summary judgment is appropriate, appellate courts are to review summary judgments
 
 de novo
 
 under the same criteria |Bthat govern the district court’s consideration of whether summary judgment is proper.
 
 Suire v. Lafayette City-Parish Consolidated Government,
 
 2004-1459 (La.4/12/05), 907 So.2d 37. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action and shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(A)(2) and (B).
 

 The burden of proof remains with the movant. LSA-C.C.P. art. 966(C)(2). However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense.
 
 Id.
 
 Thereafter, if the adverse party fads to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
 
 Id.
 

 When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere
 
 *311
 
 allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B).
 

 |flIn the instant case, plaintiff contends Ward was a “partial” manufacturer because he exercised “control or influence” over the construction of the sign by performing the following acts: (1) extending the sign’s power cord to the mounting plate; (2) placing the light bulbs provided by Sign Builders into the light fixtures on the sign; (3) installing the face of the sign with materials provided by Sign Builders; (4) applying vinyl lettering to the face of the sign; (5) fabricating the sign pole; (6) fabricating the mounting plate; and (7) bolting the mounting plate to the sign. Conversely, Ward argues that none of his actions made him a manufacturer. Ward contends he was a non-manufacturing seller of the sign, and as such, he was not liable for Mr. Haley’s injuries.
 

 The LPLA establishes the exclusive theories of liability for manufacturers for damages caused by their products.
 
 Slaid v. Evergreen Indem., Ltd.,
 
 32,363 (La.App. 2d Cir. 10/27/99), 745 So.2d 793. A manufacturer of a product is liable for damages proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity. LSA-R.S. 9:2800.54;
 
 Slaid, supra.
 
 LSA-R.S. 9:2800.53 defines “manufacturer” as follows:
 

 (1) “Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. “Manufacturing a product” means producing, making, fabricating, constructing, designing, re-manufacturing, reconditioning or refurbishing a product. “Manufacturer” also means:
 

 [[Image here]]
 

 (b) A seller of a product who exercises control over or | influences a characteristic of the design, construction or quality of the product that causes damage.
 

 (c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
 

 [[Image here]]
 

 LSA-R.S. 9:2800.53(2) provides:
 

 “Seller” means a person or entity who is not a manufacturer and who is in the business of conveying title to or possession of a product to another person or entity in exchange for anything of value.
 

 In the instant case, the following facts are undisputed: (1) Ward ordered the sign from Sign Builders; (2) Sign Builders manufactured the sign, including the installation of the ballast and shipped the sign to Ward; (3) Ward performed certain acts with regard to the sign, including extending the power cord of the sign to the mounting plate, placing the light bulbs in the sign, installing the facing on the sign, applying lettering on the sign, fabricating the pole to hold the sign, constructing the mounting plate to mount the sign, bolting the mounting plate to the sign and plugging the sign in to see if it worked properly-
 

 We must determine whether Ward’s actions with regard to the sign were sufficient to elevate his status from a “non-manufacturing seller” of the sign to “manufacturer.” Various courts have addressed this issue.
 

 
 *312
 
 In
 
 Parks v. Baby Fair Imports, Inc.,
 
 98-626 (La.App. 5th Cir.12/16/98), 726 So.2d 62, the parents of a young child filed a products liability action against K-Mai't after a shirt purchased from the store caught fire while the child was playing with a disposable lighter. The plaintiff alleged that K-Mart was a manufacturer/seller of the defective shirt, and | ^therefore, was liable for the flammability of the fabric of the shirt. The appellate court upheld summary judgment, finding that K-Mart’s act of ordering the shirt in a certain fabric and color did not rise to the level of exercising control over or influencing a characteristic of the design, construction or quality of the product. The court also found that K-Mart’s actions of inspecting finished garments already delivered to its stores did not elevate K-Mart to the status of manufacturer, stating, “The characteristics of the garment have already been determined by the manufacturer, and K-Mai’t’s testing program simply determines if the garments are of the requisite quality to sell in their stores.”
 
 Id.
 
 at 64.
 

 In
 
 Coulon v. Wal-Mart Stores, Inc.,
 
 98-1141 (La.App. 1st Cir.5/14/99), 734 So.2d 916,
 
 writ denied,
 
 99-1720 (La.9/24/99), 747 So.2d 1125, Wal-Mart sold preassembled bicycles at its store. The bicycles were assembled by an independent contractor, and once assembled, were hung on a rack to be sold to Wal-Mart customers. The plaintiffs purchased a bicycle for their son, and approximately one month later, the child was injured when a pedal fell off during a bicycle race. The plaintiffs filed a lawsuit, naming Wal-Mart as one of the defendants. It was undisputed that the defect arose during the assembly of the bicycle. The court of appeal affirmed the trial court’s determination that Wal-Mart was a manufacturer under the LPLA. The court reasoned that even if Wal-Mart did not assemble the bicycle, the store “held itself out as a manufacturer of the assembled bicycle” and failed to give notice to its customers that a separate entity assembled the bicycles for sale at its store.
 
 Id.
 
 at 920.
 

 [nIn the instant case, as noted above, shortly after the accident, the sign was inspected by Milam Electric. According to the inspection report, a secondary ballast lead was pinched between the ballast and the ballast mounting bolt within the frame of the sign. The report also noted that the pinched condition of the lead occurred “at the time of fabrication of the sign.” Ward clearly assembled the sign, as well as performed other actions necessary to prepare the sign for installation. However, there is no indication in the record that any of the actions taken by Ward had anything to do with the installation of the inner workings of the sign, including the inner wiring and/or installation of the ballasts, or that Ward contributed in any way to the pinching of the wire. Although plaintiff alleged that Ward “tightened the ballast bolts, which caused the damage to the wire,” plaintiff produced no evidence to substantiate that claim. Based on these facts, we find that Ward’s actions with regard to the sign did not rise to the level of exercising “control over or influencing a characteristic of the design, construction or quality of’ the sign in a manner which would elevate Ward to the status of manufacturer. Accordingly, we find that plaintiff failed to meet her burden of proving that Ward was a manufacturer of the sign within the meaning of the LPLA.
 

 Plaintiff also contends Ward was liable as a non-manufacturing seller of the sign because he failed to follow his company’s practice of inspecting signs to determine whether they were in proper working order. According to plaintiff, Ward knew or should have known the sign was defec
 
 *313
 
 tive because his employee(s) applied power to the sign to make sure it was 1 ^functioning.
 

 In
 
 Jackson v. Sears Authorized, Retail Dealer Store,
 
 36,166 (La.App. 2d Cir.6/12/02), 821 So.2d 590, while shopping in a Sears store, the plaintiff sat on the edge of a chair that had been placed on display. When the chair tipped over, the plaintiff fell and was injured. The chair had been manufactured by another company but had been assembled and placed on display by Sears. The plaintiff filed a lawsuit against Sears, and Sears subsequently moved for summary judgment. In support of its motion, Sears introduced the deposition testimony of an expert in structural engineering who testified that the cause of the accident was the plaintiffs act of sitting in the chair in a “vulnerable position” which caused the chair to turn over. The expert opined that the collapse of the chair was caused by a “design defect” in the chair, rather than by incorrect assembly. This court affirmed summary judgment, stating:
 

 Of course, the law is clear that a non-manufacturing seller of a defective product is not responsible for damages in tort absent a showing that he knew or should have known the product was defective and failed to declare it. Nor is a non-manufacturing seller required to inspect the product prior to sale to determine the possibility of inherent vices or defects.
 

 Under these legal standards, it is obvious that, as a matter of law, Sears, as a non-manufacturer seller, had no duty to inspect or test the product for the type of inherent design vices or defects alleged in this case. The imposition of such a duty would effectively make the non-manufacturing seller a guarantor against defects over which it had no control or responsibility. The light of reason illuminates the unduly onerous burden such a duty would inflict upon retailers.
 

 Id.
 
 at 593 (internal citations omitted). This court also concluded that the [ uplaintiff had failed to show that Sears knew or should have known of a possible defect in the chair.
 

 In
 
 Slaid, supra,
 
 the defendant, a bank, acquired ownership of a mobile home from a defaulted loan, and later reacquired the home by voluntary surrender. The bank then sold the home “as is” to Tom and Leona Walker, who, in turn, leased it to the plaintiffs. A fire broke out in the home and rescuers attempted to rescue the plaintiffs daughters who were trapped inside the master bedroom. However, they were unable to break the window of the bedroom because it was made of plexiglass which had been screwed into the frame of the trailer. The plaintiffs filed suit against the bank, alleging,
 
 inter alia,
 
 that the bank was a “non-manufacturing seller” of the mobile home, and was therefore liable for failing to warn when it knew or should have known of the home’s defective condition at the time of the sale. This court found that the bank was not a manufacturer of the mobile home within the meaning of the LPLA, but reversed summary judgment, finding that a genuine issue of material fact existed with regard to the bank’s knowledge of the condition of the window (a bank officer had conducted an inspection of it but failed to “notice anything unusual” about the home and admittedly made no effort to determine what kind of material was used to cover the windows of the mobile home).
 

 In the instant case, in support of the claim that Ward knew or should have known that the wire that ran behind the ballast was pinched, plaintiff introduced an affidavit executed by Robert T. Nethken, an electrical engineer. Nethken concurred
 
 *314
 
 that the pinched portion of the ballast wire 112was not visible. However, he opined, “[T]he fact that the red wire was run behind the ballast should have put any electrician (or person checking the sign to ensure that it was functioning properly) on notice that an unreasonably dangerous condition existed.”
 

 Willie Ward, Ward’s employee and father, testified that he inspected the sign before it was shipped to Arcadia to be installed. He stated that during his inspection, he plugged the sign in to see if all of the light bulbs were working. He also testified that he checked the sign to make sure that it was intact and to ascertain that “there’s nothing loose or something like that.” Willie Ward further testified that the power cables from the sign to the mounting plate were too short, so he extended the cables through the mounting plate to the bottom of the sign by splicing the wires from the junction box. With regard to the ballast, Willie Ward stated he checked it to determine whether or not it was loose, but he did not see any wires coming from the ballast.
 

 The report prepared by Milam Electric indicated that the defect in the sign could not be ascertained from a mere visual inspection. The report stated that employees of Milam Electric “visually inspected the wires in this conduit and did not find any indication of damage to conductor insulation.” The report also stated that because no short to the frame of the sign was found, Milam then “checked each individual ballast wire” and discovered that one of the secondary leads “was shorted to the ground.” Thereafter, the ballast was “disconnected and removed,” leading to the discovery of the pinched wire.
 

 |iaRandall Williams, a Milam Electric employee who inspected the sign after the accident, testified that when he began to inspect the leads from the ballast, he noticed that a red wire was behind the ballast but he “couldn’t see any damage to the wire, but I could see it was in behind the ballast, pinched between the ballast and the sign frame.” Williams also testified that it was “unlikely” that a person would have been able to see the wire from just looking at the sign, stating, “[I]n my opinion, it would’ve required close visual inspection for you to see that wire, because it was making a very sharp bend right as it exit — right as it comes out of the ballast, it was making a very sharp bend and going behind the ballast.” Williams testified that he had to unscrew the mount of the ballast to remove the wire to inspect it. He stated:
 

 When I got the screws loose enough, I was able to pull the wire from behind the ballast. Whenever I pulled it out to where I could see it, I could see that point in the wire right there where it was skinned, and I could see bare copper inside the insulation.
 

 On cross-examination, Williams reiterated that he could not tell that the wire had been pinched until he “loosened the ballast up and pulled that lead out from behind it.”
 

 The evidence presented showed that the pinched wire was not noticeable until the ballast was disconnected and removed after the accident. As the retailer of the sign, Ward had no duty to disassemble the sign to search for hidden defects of the type alleged in this case,
 
 i.e.,
 
 a pinched ballast wire. The installation of the ballasts and wiring was completed by Sign Builders before Ward obtained custody of the sign. Ward merely 114checked the sign to determine whether the lighting was working properly and prepared the sign for installation. Based on this record, we conclude that the trial court did not err in finding that plaintiff failed to meet her burden of proving that Ward knew or
 
 *315
 
 should have known that the sign was defective.
 

 CONCLUSION
 

 For the foregoing reasons, we affirm the district court’s grant of summary judgment in favor of defendants, Johnny Ward, d/b/a Ward Sign Company and Wellington Specialty Insurance Company. Costs of this appeal are assessed to plaintiff, Kimberly Haley, individually and as adminis-tratrix of the succession of Christopher Neal Haley and as tutrix of the minor child, Summer Haley.
 

 AFFIRMED.
 

 [1]
 

 . Plaintiff settled her claim against Sign Builders and later voluntarily dismissed the claims against Ad Sign. Service and its owners.
 

 [2]
 

 . Plaintiff did not appeal the summary judgment rendered in favor of Hanover. Rather, plaintiff's arguments are solely based upon the judgment rendered in favor of Ward and Wellington Specialty Insurance Company.